UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| Ms. Chante Morris,<br>140 Burtam Dr.<br>Clayton, NC 27520<br><br>**Plaintiff,**<br><br>v.<br><br>SAS Institute,<br>World Headquarters,<br>100 SAS Campus Drive<br>Cary, NC 27513,<br><br>**Defendant.** | Civil Action No.<br><br>Jury Trial Requested |

## COMPLAINT

### I. INTRODUCTION

1) Plaintiff Ms. Chante Morris ("Ms. Morris"), by and through undersigned counsel, brings this Complaint for discrimination on the basis of harassment and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3, *et seq*. While she worked at SAS Institute ("SAS") as a hairdresser, Ms. Morris's supervisors and other SAS employees, including high-level executives, harassed her. Then, after she filed a complaint with the Equal Employment Opportunity Commission (EEOC), SAS threatened Ms. Morris's reputation, job prospects, and personal life in an effort to silence any legal action.

### II. JURISDICTION & VENUE

2) This Court has jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. § 1331 because they arise under federal law.

3) Ms. Morris has properly exhausted her administrative remedies.

1

a. Ms. Morris filed a charge of discrimination on the basis of sex, disability, and retaliatory discrimination on December 28, 2017.

b. Ms. Morris amended her charge of discrimination on January 16, 2018 to include the recent retaliation she had endured from Defendant in Mid-December 2017 for protected activity.

c. The EEOC investigated this matter and mailed a Notice of Right to Sue on March 9, 2018.

d. The Notice of Right to Sue was received by Ms. Morris on or after March 14, 2018.

4) This Court has personal jurisdiction over SAS because SAS is located in Wake County, North Carolina.

5) Venue is proper in this Court pursuant to 42 U.S.C. Section 2000e-5 and 28 U.S.C. Section 1391 because the Defendant resides within this judicial district and because the acts and omissions complained of occurred within this judicial district.

### III. PARTIES

6) Ms. Morris is a resident of the State of North Carolina. At all times relevant to the facts of this lawsuit, she resided in North Carolina. The events complained of occurred within the state of North Carolina.

7) SAS is a privately-owned company. SAS develops and markets a suite of analytics software (also called SAS), which helps access, manage, analyze and report on data to aid in decision-making. The company is the world's largest privately held software business.

IV. FACTS

   a. **Employment Background of Ms. Morris**

8) Ms. Morris worked for SAS from February 2000 until February 2014. Throughout this time, she was a hairdresser in SAS's on-campus hair salon.

9) During this time, Ms. Morris endured an environment of constant sexual harassment that was perpetrated by her manager, high-level SAS executes, and from clients who were employees of SAS.

10) Ms. Morris made many attempts during her time at SAS to end the harassment, but because her supervisor and a high-level SAS executive were some of the worst perpetrators of this harassment, the harassment was consistent and ever-present until she was terminated.

11) During this time, Mr. Morris's performance met the standards SAS set for her.

12) Prior to late 2013, Ms. Morris never had any complaints about her performance.

13) Despite her record of strong performance and her willingness to work under poor circumstances, Ms. Morris was given notices that she would be terminated in January of 2014. She continued to work at SAS on a limited basis until mid-February 2014.

   b. **Ms. Morris was an Employee of SAS**

14) From the beginning of her employment, SAS misclassified Ms. Morris as an independent contractor when, because of the behavioral control, financial control, and relationship between the parties, Ms. Morris was an SAS employee.

15) Ms. Morris worked on the SAS campus exclusively for SAS employees. Ms. Morris did not have any clients except for SAS employees.

16) SAS controlled Ms. Morris's schedule of clients and booked appointments for Ms. Morris

17) SAS purchased, provided, and renewed all supplies necessary for Ms. Morris to work.

18) SAS controlled the prices Ms. Morris could charge for her services.

3

19) SAS controlled which services Ms. Morris could offer.

20) SAS controlled what hours Ms. Morris could work.

21) SAS provided Ms. Morris with SAS business cards and an SAS email address.

22) SAS required Ms. Morris to turn in her a report of her work to an SAS manager daily.

23) SAS required Ms. Morris to perform custodial functions for her work area.

24) SAS appointed a SAS employee to be Ms. Morris's supervisor. This supervisor oversaw her work, controller her duties, determined her pay rate, determined her hours, purchased her supplies, and eventually made the decision to terminate her.

   c. **SAS Unlawfully Harassed and Retaliated against Ms. Morris for Protected Activity**

   1. <u>Ms. Morris Engages in Protected Activity via Raising Genuine Complaints of Sexual Harassment, Retaliation, and Wrongful Termination</u>

25) In late 2017, Ms. Morris had reported and engaged with SAS to pursue a settlement of potential claims for sexual harassment, retaliation, and wrongful termination.

26) Ms. Morris's complaints included:

    a. Her male supervisor making repeated and constant comments about the size of her breasts.

    b. Her supervisor, when Ms. Morris requested time off because she was getting a breast reduction surgery – a surgery she was seeking solely to stop the ceaseless sexual harassment she faced from her management and other SAS employees – told her that she would lose half of her male clientele if she got the surgery. The supervisor stated that her clients did not come to see her for her haircuts, they came to see her for "those" – pointing and referring to her breasts.

c. Her clients, who were SAS Employees, continually making inappropriate comments and "jokes" about her body.

d. A male senior SAS executive would also get haircuts from her and would frequently make comments about her breasts and her physical appearance throughout her employment by SAS.

e. Another SAS employee and regular client of Ms. Morris prior to her breast reduction surgery told her that he had not gotten his permission to get rid of "them" – referring to her breasts. Then when she informed him that she was going to end the conversation and that this had nothing to do with him, he told her to at least tell the doctor to save what they removed so that he could keep them for himself.

f. Finally, in 2013 she attempted to remedy the situation by complaining about the behavior to Human Resources ("HR") and to a senior SAS executive.

g. In response to her complaints, HR did nothing to assist her.

h. In retaliation for her complaints about him, her supervisor, for the first time in her nearly 14 years of working there, assigned her janitorial duties, including washing the trash can, mopping and vacuuming, cleaning her salon chair, etc.

i. While Ms. Morris was cleaning her salon chair after completing all her appointments for the day, her supervisor came by and she complained to him that she should not have these new duties and that this action was hurting her back. The supervisor responded that he thought she would be used to being on her knees – a clear, intentional, and cruel sexual statement.

j.  Still in late 2013, Ms. Morris continued to report both the new sexual harassment and the retaliatory measures that her supervisor was forcing on her to HR. HR continued to not act for her benefit in any way.

27) Ms. Morris, acting *pro se*, attended a mediation session with SAS to attempt to resolve these claims in December 2017.

28) This mediation session failed to resolve Ms. Morris's potential litigation.

   2. <u>Ms. Morris is Retaliated Against for her Protected Activity</u>

29) Shortly after this failed mediation, a high-level SAS employee, came to Ms. Morris's new workplace and attempted to threaten and intimidate her in an effort to induce her to drop all potential claims against SAS.

30) This high-level employee was, and based on information and belief, still is a Senior Manager at SAS when he approached and threatened Ms. Morris.

31) On information and belief, this Senior Manager is also a close friend of a high-level SAS executive.

32) At the time he attempted to intimidate Ms. Morris into dropping her claims, the Senior Manager was also a consistent client of Ms. Morris at the hair salon she was working at in mid-December 2017.

33) The Senior Manager made his threats after Ms. Morris completed his appointment. He was her last appointment of the night so the conversation took place at around 8:30 PM

34) It was at the time and continues to be now, Ms. Morris's belief that this Senior Manager was acting as an agent of SAS throughout the threatening conversation.

35) Ms. Morris was incredibly scared, upset, and emotionally distraught following the threats she faced.

36) Ms. Morris was concerned that SAS would do everything in their power to end her career and destroy her reputation if she were to continue to pursue any claims against them.

37) Nevertheless, Ms. Morris felt wronged by what had happened to her and later that month filed a charge with the EEOC.

**V. COUNT I – SEXUAL HARASSMENT IN VIOLATION OF 42 U.S.C. § 2000E-3, *ET SEQ*.**

38) Ms. Morris repeats and re-alleges every allegation contained in paragraphs 1 through 37 of this Complaint as if set forth fully herein.

39) As a woman, Ms. Morris belongs to a protected class under Title VII.

40) SAS employs more than fifteen (15) people and is a covered entity under Title VII.

41) Ms. Morris's supervisor and other male employees of SAS repeatedly harassed Ms. Morris by making unwanted, derogatory, and discriminatory sexual comments about her body. This conduct was directed at Ms. Morris by reason of her gender.

42) Although Ms. Morris repeatedly complained to HR about the harassment, HR took no action to stop the harassment.

43) This conduct was sufficiently severe and pervasive enough to unreasonably interfere with Ms. Morris's physical health, work performance and so as to create an intimidating, hostile and offensive working environment.

44) This harassment affected the terms, conditions, and privileges of her employment, culminated in the termination of her employment, and continued even after her employment had been terminated.

45) As a direct, proximate, and foreseeable result of SAS's unlawful conduct, Ms. Morris has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental

7

Case 5:18-cv-00269-D   Document 1   Filed 06/11/18   Page 7 of 10

anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

### VI. COUNT I I– RETALIATION FOR COMPLAINTS OF DISCRIMINATION AND SEXUAL HARASSMENT IN VIOLATION OF 42 U.S.C. § 2000E-3, *ET SEQ*.

46) Ms. Morris repeats and re-alleges every allegation contained in paragraphs 1 through 45 of this Complaint as if set forth fully herein.

47) Ms. Morris repeatedly reported the harassment she faced to managers and to HR while employed at SAS.

48) Ms. Morris also raised her concerns with the sexual harassment she faced in late-2017, this action along with stated intent to pursue claims based on the sexual harassment and retaliation she had already faced led to retaliatory threats by SAS.

49) On information and belief, the threats communicated to Ms. Morris through an agent of SAS were intended to silence her and prevent her from engaging in further protected activity.

50) Ms. Morris experienced extreme emotional distress and anxiety as a result of these threats.

51) On information and belief, Ms. Morris's ability to find gainful employment has been seriously damaged by SAS employee and management actions undertaken to damage her reputation and to deprive her of paying clientele.

52) As a direct, proximate, and foreseeable result of SAS's unlawful conduct, Ms. Morris has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

## VII. Prayer for Relief

WHEREFORE, Plaintiff, Ms. Chante Morris prays for the following relief: Entry of judgment in favor of Plaintiff and against Defendant for:

    a.    Back pay;

    b.    Front pay;

    c.    Compensatory damages;

    d.    Emotional distress;

    e.    Reasonable attorneys' fees and court costs associated with this suit;

    f.    Awarding prejudgment interest, costs and disbursement as appropriate herein; and

    g.    Other relief as may be appropriate to effectuate the purposes of the Title VII and that the jury deems equitable, appropriate, and just.

## VIII. Jury Demand

53) Ms. Morris demands a jury trial.

Respectfully submitted,

/s/ *Robert Porter*

Robert Porter
*Pro Hac Vice Application Pending*
The Spiggle Law Firm, PLLC
4830 31st St., S. Ste. A
Arlington, Virginia 22206
(202) 449-8527
(202) 540-8018 (fax)
tspiggle@spigglelaw.com
rporter@spigglelaw.com

*Attorney for Plaintiff*


/s/Clay Hodges
Clay Hodges
Harris Sarratt & Hodges, LLP
3948 Browning Place, Suite 334
Raleigh, NC 27609
919.546.8788
919.546.8789 (fax)
chodges@hshllp.com
NC Bar Number: 29270
*Local Counsel Pursuant to Local Rule 83.1*